02-12-482-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00482-CV

 

 


 
 
 In
 the Interest of S.L.-E.A.
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 323rd District
 Court
  
 of
 Tarrant County (323-95834J-11)
  
 March
 21, 2013
  
 Opinion
 by Justice Walker
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Sue Walker

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00482-CV

 

 


 
 
 In the Interest of S.L.-E.A.
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          This
is an ultra-accelerated appeal.[2] 
Father, who has engaged in a continuous course of criminal conduct from 1988 to
2009 and has seen his son S.L.-E.A. only twice during the child’s life, appeals
the termination of his parental rights to S.L.-E.A.  In
five issues, Father challenges the trial court’s paternity findings and argues
that the evidence is legally and factually insufficient to support the trial
court’s termination findings under Texas Family Code section 161.001(1)(D),
(E), (N), and (O).  We will affirm.

II.  Factual and Procedural Background

          Because
this appeal can be disposed of under the endangering conduct finding and
because Father does not challenge the trial court’s best interest finding, we
omit testimony related to the best interest factors in the background set forth
below.

A. 
Father’s Criminal History

          At
the outset of the trial, Father admitted that he had a long criminal history
and agreed that he had a continuing course of criminal conduct.  Father
testified regarding numerous arrests and convictions spanning from 1988 to
2009.

In
1988, Father
was convicted of robbery and was placed on community supervision for ten years;
it was revoked, and he ultimately served time in prison. 

In
1991, Father was arrested for DWI but pleaded guilty to reckless misconduct. 

In
1999, Father was arrested for theft of property $50 to $500.  Father did not
recall being arrested twenty-two days after the theft for burglary of a vehicle
that occurred on December 17, 1999.  The Department of Family and Protective
Services (hereinafter “the Department”) admitted into evidence a judgment,
showing that Father was sentenced to thirty days’ confinement for burglary of a
vehicle. 

In
2000, Father was arrested for forgery of a financial instrument and was placed
on two years’ community supervision.  He was arrested later in 2000 for driving
while his license was suspended and for theft of property greater than $50 with
prior convictions.  Father did not recall being arrested in Humble, Texas, for theft
of property $50 to $500. 

In 2003,
Father was arrested for theft of property $1,500 to $20,000 in Fort Worth.  He
was convicted and sentenced to nine months’ confinement in state jail. 

In
2004, Father was arrested for burglary of a building but pleaded down to
criminal trespass; Father was sentenced to forty days in jail.  A week after
Father was released from jail, he was arrested again for burglary of a
building; he pleaded guilty and was ultimately sentenced to one year in jail.  In
October 2004, Father was arrested for unauthorized use of a motor vehicle and
was sentenced to six months’ confinement in state jail. 

Father
did not recall being arrested for unauthorized use of a motor vehicle in
Houston in May 2005.  The Department admitted into evidence a judgment on his
plea of guilty in which Father was sentenced to forty-five days’ confinement
for
unauthorized use of a motor vehicle.  

Father
also did not recall being arrested for another unauthorized use of a motor
vehicle in January 2006 and being sentenced to twenty days’ confinement. In May
2006, Father was charged with assault in Austin; Father testified that he
assaulted his male roommate after the roommate attacked him.  Father spent thirty
days in jail.  In October 2006, Father was arrested for criminal trespass in
Round Rock; he was sentenced to 180 days’ confinement.  Father did not recall
also being charged in October 2006 with theft of property less than $1,500 with
two or more prior convictions. 

In
2009, Father pleaded guilty to cultivation of a controlled substance because
marijuana was growing on the property that Father was leasing; Father received
two years’ community supervision.[3]  

B. 
Father’s History with Mother and S.L.-E.A.’s Birth

Father
testified that he is the father of S.L.-E.A.  Mother left Father when she was
two months’ pregnant with S.L.-E.A.  Father explained that Mother “likes to
fuss and fight” and described her as “kind of volatile.”  

Mother
notified Father on Facebook in early December 2011 that S.L.-E.A. had been born
on November 10, 2011.[4]  Father
was concerned that Mother and S.L.-E.A. had tested positive for marijuana at the
time of S.L.-E.A.’s birth.  Father knew that Mother had a problem with drugs
and said that she used “whatever she could get her hands on.”  Father said that
Mother was not a “fit parent.” 

C. 
S.L.-E.A.’s Removal from Mother

In
late December 2011, Mother notified Father that she had fought with her mother,
that she had moved to a shelter, and that the shelter had made a report to Child
Protective Services (CPS).  S.L.-E.A. was removed from Mother at the
shelter because she had left him alone in the room and had allowed others at
the facility to care for him. 

D. 
CPS’s Investigation

Veronica
Swink, a CPS investigator, testified that a referral came in on December 10,
2011, stating that Mother did not receive prenatal care, that Mother had used
marijuana during the first six months of her pregnancy, that S.L.-E.A. had tested
positive for marijuana, that Mother had mental health issues and was not taking
her medication, and that Father had supplied Mother with drugs. 

Swink
spoke with Father, who was living in Houston, over the phone and told him that
there was an open investigation, that Mother had agreed to do Family-Based
Safety Services (FBSS), that there was a concern about drug use and family
violence,[5] and
that Father was not allowed to have unsupervised contact with S.L.-E.A.  Swink
told Father that when he moved to Fort Worth, he could have supervised visits
with S.L.-E.A.  Swink did not perform a drug test on Father, nor did she look
at his residence.  Father was offered FBSS and was willing to participate.  

Swink’s
disposition of the case was “Reason To Believe for physical abuse” of S.L.-E.A.
by Mother and “Reason To Believe for neglectful supervision” of S.L.-E.A. by Mother’s
mother.  Swink did not make any findings related to Father.[6] 

E. 
Father’s Trip to See S.L.-E.A. and Arrest on Outstanding Warrant

After
Father spoke with Swink, he took the bus to Fort Worth and stayed in a homeless
shelter in order to conserve his resources so that he could rent his own place.
 Father visited with S.L.-E.A. once during this trip to Fort Worth.  But after
three or four days at the homeless shelter, Father was arrested on a warrant
out of Oklahoma because he was behind on his fines and court
costs.  

F. 
Father’s Housing, Income, and Transportation

After
Father bonded out of jail, he set up a home in Oklahoma and made preparations to
bring S.L.-E.A. home.  He testified that at the time of the
termination trial, he was renting a three-bedroom home on 120 acres in Okemah,
Oklahoma, and had lived there by himself for four months.  Father described the
area where he lives as “nice and serene” and testified that there are no drugs
or criminal activity.  Father said that he has a crib, two car seats, a baby
bed, a stroller, and a bounce seat for S.L.-E.A.  But Father admitted that he
had been moving around during S.L.-E.A.’s life and agreed that he had not
demonstrated over the course of the case an ability to provide S.L.-E.A. with a
safe and stable living environment. 

Father
testified that he receives $698 in SSI each month “for an anxiety disorder”[7] and
that he makes approximately $400 per month doing odd jobs. Father pays $250 for
his rent, and his bills average approximately $455 per month.  Father said that
he could get food stamps and Medicaid for S.L.-E.A.  

Father
explained that he had transportation issues:  he owed $100 to get his driver’s
license reinstated and did not have car insurance; he planned to pay a $100
reinstatement fee for his driver’s license so that he could drive his car.  Father’s
license was suspended at the time of the termination trial and had been
suspended since 2005, but he drove until 2009.  Father testified that he could
call for transportation at no cost. 

G.  CPS’s
Testimony Regarding Father’s Services

Gale
Davis, the CPS conservatorship worker for S.L.-E.A., developed a service plan
for Father.  Father signed the service plan on March 9, 2012.[8]  In
April, Father requested an extension of time to complete his parenting classes
until he could purchase high-speed internet.  Davis responded “[j]ust complete
them as soon as you can.”  Davis testified that the only thing that
Father completed on his service plan was one of the eight modules in his online
parenting class. 

Davis
testified that Father called her once a week at the beginning of the case, but
he stopped calling in April 2012.  Davis had not conducted a home study on Father’s
home in Oklahoma.  The one drug test conducted on Father was negative for everything.[9] 

H. 
Father’s Testimony Regarding His Compliance with His Service Plan

Father
testified that his service plan was mailed to him but that he did not complete
his services.  Father believed that Mother was working toward getting custody
of S.L.-E.A., and so he “kind of backed off” because he believed that “the
Court usually goes towards the mother.” 

Father
explained that he did not participate in individual counseling because he did
not have transportation.  

Father
had not completed parenting classes because he did not have high-speed
internet.  Father said that high-speed internet would cost $60 per month.  

Father
was unable to visit with S.L.-E.A. during the year prior to the termination
trial because he did not have $128 for the bus fare for the five-hour trip and
would need permission to leave Oklahoma due to his community supervision. 

Father
had not submitted to a drug and alcohol assessment. 

Father
did not provide proof of financial stability, as required by his service plan, but
at the time of the termination trial, he had provided an appropriate
housing plan and had lined up transportation. 

Father
testified that he had not maintained weekly contact with his caseworker, as
required by his service plan.  Father went six months without having contact
with CPS because

I kind of got discouraged with it.  You want to know
why?  I’ll tell you.  Because doing the service plan, in your mind, that’s the
number one priority, but in my mind, it wasn’t, because I didn’t have my own
home yet, so I tried to figure out what’s the first things first, so I needed
to get a home, so I started striving to do that. Getting the service plan done,
I wasn’t doing drugs, I didn’t feel like I needed an assessment done, I’m not
doing any drugs, and the parenting class, I wasn’t able to do it, so I just
kind of discarded it and focused on getting a place to live and all that and
wait on a court date and try to come here and present myself as a sober
individual ready to take care of his son, and that’s why I’m here now. 

Father
said that he was willing to work his services now that he had a home, a support
group, and transportation in place. 

I. 
Father’s Parenting Skills

Father
testified that he had experience in caring for young children; he had cared for
his daughter for the first two years of her life from 1990 to 1992.[10] 

Father
visited with S.L.-E.A. for the second time in his life during the week before
the termination trial.  During the visit, Davis noted that Father interacted
well with S.L.-E.A., that Father was appropriate in giving affection, and that Father
checked S.L.-E.A.’s diaper. 

Father
testified that he would allow his sister’s husband, who is a registered sex
offender, to drive S.L.-E.A. around.  Father did not believe that it would be
unsafe to leave S.L.-E.A. with Father’s sister’s husband because he and his
wife P. (Father’s sister) were already raising Father’s son K.  Father testified
that he had initiated a report to have the situation—that
his son K. was living with a registered sex offender—checked
out, and “it checked out okay.”  Father later testified that
it concerned him that his brother-in-law was twenty-three or twenty-four at the
time he had sexual contact with a thirteen year old. 

J. 
Father’s Plans

Father
testified that he is a different person now than he was two years ago.  Father
testified that he could provide a good home for his son.  Father had not
engaged in criminal conduct during the year prior to the termination trial and
testified that he would not use drugs and would not engage in criminal activity
in the future.[11] 

Father
planned to get his driver’s license reinstated so that he would be able to
drive S.L.-E.A. to the doctor, if necessary.  Until then, he had friends who
were willing to drive him. 

Father
defined a “fit parent” as someone who gives financial support, stimulation,
rules, and guidelines; who teaches the child the alphabet; who changes diapers;
and who talks to the child.  Father admitted that he had not provided for
S.L.-E.A. financially; that he had not laid down any rules or guidelines for
S.L.-E.A.; that he had not taught S.L.-E.A. the alphabet; that he had changed only
one diaper; that he had not communicated with S.L.-E.A. from December 2011
until the October 24, 2012 visit; and that he had not provided correction and
direction to S.L.-E.A.  

Father
agreed that S.L.-E.A. deserves to be raised by someone who is stable, who is
willing to follow the law, who is able to provide for him financially, and who
is concerned about his physical health.  Father agreed that over the prior
twenty years, he had been “anything but stable.”  Father
testified that more than half of the blame was his because he should have
already been stable. 

Father
testified that he did not want his rights terminated; he wants to be a part of his
son’s life. 

K. 
Recommendations

Father’s
sister P.[12]
testified that she did not believe Father’s parental rights should be
terminated because he has turned his life around.  She admitted that he has a
long history of criminal conduct and of drug use, which
included use of methamphetamine and marijuana, 

but he has gotten off drugs, he’s gotten himself together
and made the right choices, so I think he should have a chance to have a
relationship with his child, plus this child was not taken away from him.  This
child was taken away from [Mother] because of her choices and action.  

P.
believed that Father had changed because he had taken responsibility for his
past actions, had obtained a job and a car, and was not using drugs.  P.
said that Father has her support to help raise S.L.-E.A.  P. believed
that Father “will do whatever he needs to do to provide for [S.L.-E.A.] and give
that child a stable life.” 

P.
testified that she would not, however, allow Father to raise her children but
that she allowed him to have supervised contact with her children.  P.
explained that she did not think that Father was financially stable enough to
raise her children, including his son K. 

Davis,
S.L.-E.A.’s conservatorship worker, asked the trial court to terminate Father’s
parental rights and testified that she believed that it is in S.L.-E.A.’s best
interest for Father’s parental rights to be terminated.  Davis said that Father
has not been involved in S.L.-E.A.’s life, has not demonstrated an ability to
parent effectively, has a criminal history that is concerning, and has an untreated
mental health issue.  Davis said that there are “just too many variables that
cause[] him to appear to be unstable.” 

Lori
Archibald, the Court-Appointed Special Advocate, testified that CASA
recommended termination of Father’s parental rights based on his lack of contact
with S.L.-E.A. 

During
closing, the ad litem for S.L.-E.A. recommended termination of Father’s
parental rights.  His recommendation was based on Father’s continuing course of
criminal conduct, his failure to work the service plan, his failure to exercise
visitation other than on two occasions, and his failure to demonstrate an
ability to take care of a “medically-needy” child. 

L. 
Trial Court’s Disposition

After
noting at the outset of the trial that a “Certificate of Paternity Registry
Search” was on file indicating that a diligent search of the registry had been
made and no “Notice of Intent to Claim Paternity” had been located, the trial
court found by clear and convincing evidence that Father did not file an
admission of paternity or a counterclaim for paternity and that Father had not
registered with the paternity registry.  After hearing the testimony above, the
trial court found by clear and convincing evidence that Father had knowingly
placed or knowingly allowed S.L.-E.A. to remain in conditions or surroundings that
had endangered S.L.-E.A.’s physical or emotional well-being, had engaged in
conduct or knowingly placed S.L.-E.A. with persons who had engaged in conduct that
had endangered S.L.-E.A.’s physical or emotional well-being, had constructively
abandoned S.L.-E.A., and had failed to comply with the provisions of a court
order that specifically established the actions necessary for Father to obtain
the return of S.L.-E.A.  The trial court thereafter signed an order terminating
Father’s parental rights to S.L.-E.A. 

III. 
Burden of
Proof and
Standard of
Review

 

In a
termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except the
child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, “[w]hen the State
seeks to sever permanently the relationship between a parent and a child, it
must first observe fundamentally fair procedures.”  In re E.R., 385
S.W.3d 552, 554 n.1 (Tex. 2012) (citing Santosky v. Kramer, 455 U.S.
745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Id.; Holick, 685 S.W.2d at 20–21.

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008).  Due
process demands this heightened standard because “[a] parental rights
termination proceeding encumbers a value ‘far more precious than any property
right.’”  E.R., 385 S.W.3d at 555 (quoting Santosky, 455 U.S. at
758–59, 102 S. Ct. at 1397); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex.
2007) (contrasting standards for termination and conservatorship).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Tex. Fam. Code Ann. § 101.007 (West 2008).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629
(Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the challenged ground for termination was
proven.  In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).

We
review all the evidence in the light most favorable to the finding and
judgment.  Id.  We resolve any disputed facts in favor of the finding if
a reasonable factfinder could have done so.  Id.  We disregard all
evidence that a reasonable factfinder could have disbelieved.  Id.  We
consider undisputed evidence even if it is contrary to the finding.  Id. 
That is, we consider evidence favorable to termination if a reasonable
factfinder could, and we disregard contrary evidence unless a reasonable
factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that Father violated section 161.001(1)(D), (E),
(N), or (O).  See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N),
(O); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).    If, in light of
the entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209
S.W.3d at 108.

IV. Legally
and Factually
Sufficient Evidence
Supports Section
161.001(1)(E) Endangering Conduct
Finding

 

          In
his third issue, Father argues that the evidence is legally and factually
insufficient to support the trial court’s section 161.001(1)(E) endangering
conduct finding.  Specifically, Father argues that the Department offered no
evidence that Father’s conduct posed any danger to his son and that he never
had possession of his son to place him with anyone. 

As
we have explained in a similar case,

          Endangerment
means to expose to loss or injury, to jeopardize. . . .

 

          . . . .

 

          . . . Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child’s physical or emotional well-being was the direct
result of the parent’s conduct, including acts, omissions, and failures to
act.  Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

          To support
a finding of endangerment, the parent’s conduct does not necessarily have to be
directed at the child, and the child is not required to suffer injury.  The
specific danger to the child’s well-being may be inferred from parental
misconduct alone, and to determine whether termination is necessary, courts may
look to parental conduct both before and after the child’s birth. . . .  As a
general rule, conduct that subjects a child to a life of uncertainty and
instability endangers the child’s physical and emotional well-being.

 

In
re A.J.M., 375 S.W.3d 599, 605 (Tex. App.—Fort Worth 2012, pet.
denied) (en banc).

          Even
though imprisonment standing alone does not constitute a continuing course of
conduct that endangers the physical or emotional well-being of a child, it is a
factor that we may properly consider on the issue of endangerment.  In re
E.N.C., 384 S.W.3d 796, 805 (Tex. 2012); Boyd, 727 S.W.2d at 533–34;
In re M.R., 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). 
The Department is not required to show that incarceration was a result of a
course of conduct endangering the child; it must show only that incarceration
was part of such a course of conduct.  Boyd, 727 S.W.2d at 533–34; M.R.,
243 S.W.3d at 819.  When incarceration affects the parent’s ability to care for
his child, to provide safe living conditions, or to ensure the child’s safety
and well-being, then such incarceration can be a part of a course of continuing
conduct.  See M.R., 243 S.W.3d at 819.  Even evidence of criminal
conduct, convictions, and imprisonment prior to the birth of a child can
support a finding that a parent engaged in a course of conduct that endangered
the child’s well-being if the Department introduces evidence concerning the
offenses and establishes that the offenses were part of a voluntary course of conduct
that endangered the child’s well-being.  E.N.C., 384 S.W.3d at 804–05; A.J.M.,
375 S.W.3d at 606.

A
factfinder may infer from past conduct endangering the well-being of the child
that similar conduct will recur if the child is returned to the parent.  In
re M.M., No. 02–08–00029–CV, 2008 WL 5195353, at *6 (Tex. App.—Fort
Worth Dec. 11, 2008, no pet.) (mem. op.); see also Smith v. Tex. Dep’t of
Protective & Regulatory Servs., 160 S.W.3d 673, 681 (Tex. App.—Austin
2005, no pet.) (“[I]n considering the best interest of the child, evidence of a
recent turn-around in behavior by the parent does not totally offset evidence
of a pattern of instability and harmful behavior in the past.”).  Further,
“evidence of improved conduct, especially of short-duration, does not
conclusively negate the probative value of a long history of drug use and
irresponsible choices.”  In re J.O.A., 283 S.W.3d 336, 346 (Tex. 2009).

          Here,
the fact that Father was not present when S.L.-E.A. was removed and never had
possession of S.L.-E.A. does not preclude the trial court’s finding of
endangering conduct; a child’s emotional well-being can be negatively affected
when parents repeatedly commit criminal acts that subject them to incarceration
that results in their being absent from the child’s life and unable to provide
support, thus creating an emotional vacuum in the child’s life and subjecting
the child to ongoing uncertainty regarding who will care for him.  See In re
B.P.W., No. 02-05-00288-CV, 2006 WL 2507340, at *2 (Tex.  App.—Fort Worth
Aug. 31, 2006, no pet.) (mem. op.).

As
set forth above, the record contains seven judgments related to various crimes
committed by Father.  The record also contains Father’s testimony regarding his
multiple arrests from 1988 to 2009, including testimony that at the time of the
termination trial, Father was on community supervision for the 2009 cultivation
charge.  Father admitted that he had a long criminal history and agreed that he
had engaged in a continuing course of criminal conduct.  Father’s testimony
regarding his instability reveals that his criminal violations and
incarcerations affected his ability to provide a stable living environment for
S.L.-E.A.

Father
described Mother as “kind of volatile” and “not a fit parent” and admitted that
he knew that Mother used drugs.  The record reveals that despite Father’s
knowledge of Mother’s drug use, her volatility, and her unfitness as a parent,
he did not attempt to rescue S.L.-E.A. from her; instead, he met S.L.-E.A. for
the first time after S.L.-E.A. was removed from Mother for neglectful
supervision.  Moreover, when Father believed that Mother was working her
services, he backed off in working his services.

This
is not, as Father argues, a case like In re E.N.C., 384 S.W.3d 796 (Tex.
2012).  In that case, the supreme court held the evidence legally insufficient
under section 161.001(1)(E) to constitute an endangering course of conduct
because—unlike the scenario before us—the Department did not put on any
evidence concerning the single offense committed by father years before
his children were born, nor did the Department put on evidence regarding the
circumstances of the father’s deportation.  Id. at 798.  The evidence in
E.N.C.—unlike the evidence presented here—revealed that after the father
was deported, he provided for his children, he kept in contact with the
Department, he visited with his children through monthly phone conferences, and
he testified that he never saw the children’s mother use drugs.  See id.
at 798–801.  E.N.C. is thus distinguishable on its facts. 

Although
Father had made positive improvements in his life by renting a home, by gathering
the necessary items for a young child, and by staying off drugs and not
committing any new crimes while the case was pending, evidence of improved
conduct, especially of short duration, does not conclusively negate the
probative value of a long history of criminal conduct and irresponsible
choices.  See J.O.A., 283 S.W.3d at 346.  Viewing all the evidence in
the light most favorable to the trial court’s judgment and recognizing that the
factfinder is the sole arbiter of the witnesses’ credibility and demeanor, we
hold that there was some evidence of endangering conduct on which a reasonable
factfinder could have formed a firm belief or conviction that Father had
engaged in conduct or had knowingly placed S.L.-E.A. with persons who had engaged
in conduct that endangered his physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(E); J.O.A., 283 S.W.3d at 346
(holding evidence legally sufficient to support trial court’s section
161.001(1)(E) finding because father had a long history of drug use and
irresponsible choices, including an arrest for domestic violence); In re
V.V., 349 S.W.3d 548, 555–57 (Tex. App.—Houston [1st Dist.] 2010, pet.
denied) (holding evidence legally sufficient to support trial court’s section
161.001(1)(E) finding because father had extensive criminal history and made no
effort to care for his daughter when he was not incarcerated); In re
M.J.M.L., 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied)
(holding evidence legally sufficient to support trial court’s section
161.001(1)(E) finding because father knew mother was a drug addict and left
child in mother’s care); see also In re A.H., No. 02-12-00096-CV, 2012
WL 4450490, at *7–8 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op.)
(holding evidence legally sufficient to support trial court’s section
161.001(1)(E) finding because mother’s drug use, unstable work and housing
history, decisions to leave her children with known drug users, and history of
criminal violations and incarcerations affected her ability to provide a stable
living environment for child).

Giving
due deference to the factfinder’s endangering conduct finding, without supplanting
the factfinder’s judgment with our own, and after reviewing the entire record,
we hold that a factfinder could reasonably form a firm conviction or belief
that Father had engaged in conduct or had knowingly placed S.L.-E.A. with
persons who had engaged in conduct that endangered his physical or emotional
well-being.  See A.J.M., 375 S.W.3d at 607–09 (holding evidence
factually sufficient to support trial court’s section 161.001(1)(E) finding
because father had chosen to break the law, risking and resulting in
incarceration and inability to care for his daughters and that he had also left
them with an inappropriate caregiver); A.H., 2012 WL 4450490, at *7–8
(holding evidence factually sufficient to support trial court’s
section 161.001(1)(E) finding because mother’s drug use, unstable work and
housing history, decisions to leave her children with known drug users, and
history of criminal violations and incarcerations affected her ability to
provide a stable living environment for child).  We overrule Father’s third
issue.[13]

V.  Conclusion

          Having
overruled Father’s third issue, which is dispositive of the appeal, we affirm
the trial court’s judgment terminating Father’s parental rights to S.L.-E.A.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER,
MCCOY, and MEIER, JJ.

 

DELIVERED:  March 21, 2013









[1]See Tex. R. App. P. 47.4.





[2]See Tex. R. Jud.
Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment
terminating parental rights within 180 days after notice of appeal was filed). 
We note that our opinion is required to issue on or before May 29, 2013.





[3]Father testified that his
community supervision term was set to expire in January 2013. 





[4]S.L.-E.A. was born
with a birth defect in his heart.  He was diagnosed with severe pulmonary
artery branch hypoplasia, super-valve aortic stenosis, and a small aorta.  His
condition requires that he be watched carefully because doctors are not sure
how his growth will affect his heart; he needs to be constantly monitored to
see whether his lips are turning blue and whether his extremities are cold.  An
angiogram that was performed on October 5, 2012, was not successful in improving
his circulation.  

 

Father believed that
S.L.-E.A. could have life-threatening heart problems and requested that
S.L.-E.A. be tested for Williams Syndrome because heart problems run in his
family.  The test was negative.  





[5]Father told Swink that he
and Mother had gotten into “spats” and that Mother had hit him; Father denied
ever physically assaulting Mother.  Mother told Swink that Father had “split
her head open on three occasions” and that Father was physically violent
because he was using cocaine, marijuana, and methamphetamine. 





[6]Father testified that
he had no idea why his son was in foster care because he was not there when
S.L.-E.A. was removed from Mother; Father understood that there were
allegations that Mother was neglecting S.L.-E.A.  Because S.L.-E.A. was removed
from Mother, Father did not understand why he was under so much scrutiny.  Father
later agreed that he was not available to take custody of S.L.-E.A. in December
2011 and that foster care was the only option at that time. 





[7]Father said that he had
been diagnosed with Schizo-affective disorder.  He initially took medication
for his condition, but then he discontinued the medication and resolved his anxiety
“through environment.” 





[8]Davis testified that the
court had not made an order for the service plan to become an order of the
court. 





[9]Father testified that he had
started using marijuana and cocaine in 1998 but that he had not used cocaine in
two and a half or three years.  Father later testified that he had not used
marijuana and cocaine for one and a half to two years.  Father said that he
used drugs when he was depressed but that he was over that now. 





[10]Father testified that in
addition to S.L.-E.A., he had a daughter M., who was born in 1990; a son S.,
who was born in 2000 and was deceased; and a son K., who was born in 2009. 
None of Father’s children lived with him at the time of the termination trial.





[11]At the time of the
termination trial, Father was on community supervision for his cultivation
charge.  Father had paid all of his community supervision fees in order to
leave the State of Oklahoma to attend the termination trial in Texas.  He was
paying $50 per month on his court costs and fines, instead of the $25 minimum
monthly payment, in order to pay them off quickly.  





[12]P. is married to a
registered sex offender, and her nineteen-year-old son has been charged with a
sexual offense involving a six-year-old male.  P. was in the process of
adopting Father’s three-year-old son K., to whom Mother and Father had voluntarily
relinquished their parental rights. 





[13]Because only one ground
under section 161.001(1) is needed to support termination, we need not reach
Father’s second, fourth, and fifth issues pertaining to the trial court’s
findings under subsections (D), (N), and (O).  See Tex. R. App. P. 47.1
(stating that appellate court need only address every issue necessary to final
disposition of appeal).  And because the trial court terminated Father’s
parental rights to S.L.-E.A., despite Father’s failure to file an admission of
paternity or to register with the paternity registry, we need not address
Father’s first issue challenging the paternity findings in the termination
order.  See id.